ILDERTON OIL COMPANY v. R. J. RIGGS, NORMAN L. GRUBB
AND ELLER AND SLATE OIL CO., INC.

No. 7218DC178

(Filed 23 February 1972)

1. **Landlord and Tenant § 7— removal of trade fixtures — right of third party**

   An oil company which placed an underground storage tank, pump and accessory equipment on leased premises under agreement with the tenant had the same right to remove them as the tenant would have had if the tenant had owned them.

2. **Landlord and Tenant § 7— leased property — trade fixtures — removal by third party — abandonment to landlord**

   Where an oil company, under an agreement with the tenant, placed an underground storage tank and accessory equipment on the leased premises for storage and dispensation of diesel fuel supplied by the oil company to the tenant for use in the tenant's vehicles, the tenant and the oil company expressly agreed that the tank and equipment would remain the property of the oil company, the tenant was told by the landlord that the tank could be put anywhere on the property as long as allowance was made for proper parking, and after the tenant's lease expired the oil company tried unsuccessfully to become the new tenant's diesel fuel supplier and to sell the tank and equipment to the new tenant's supplier, it was *held* (1) that at the time of installation all the parties intended that the tank and equipment were to be removable as trade fixtures, and (2) that the oil company did not relinquish or abandon them to the landlord by its failure to remove them prior to the expiration of the tenant's lease and the tenant's surrender of the premises.

APPEAL by plaintiff from *Carrington, District Judge,* 21 December 1971 Session of District Court held in GUILFORD County.

*Haworth, Riggs, Kuhn & Haworth by John Haworth for plaintiff appellant.*

*Bencini, Wyatt, Early & Harris by A. Doyle Early, Jr., for defendant appellees.*

MALLARD, Chief Judge.

There is no controversy about the facts found by the judge. They are stated by appellant in its brief, and concurred in by the defendants, as follows:

"Before 5 January 1971 CLC RENTALS, INC. (CLC) leased as tenant by (sic) the defendant R. J. RIGGS (RIGGS) the land and buildings located at 2011 Bethel Drive in High Point. Shortly before that date CLC entered into an oral agreement with plaintiff whereby plaintiff supplied diesel fuel to CLC at agreed prices. As part of the transaction plaintiff at its own expense procured and installed on the leased premises an underground storage tank with pump and accessory equipment where diesel fuel supplied to CLC was stored and from which it was dispensed to CLC vehicles. It was agreed orally between CLC and plaintiff that the tank, pump and equipment would remain the property of the plaintiff and would be removed by plaintiff when CLC discontinued using the premises.

There was no agreement between plaintiff and RIGGS as to the installation or removal of the tank. Before the tank was installed, however, JOHN L. MURROW, JR., Vice-President of CLC, told RIGGS he was thinking about putting a tank on the property, asked RIGGS for suggestions as to where it should be put, and was informed by RIGGS to 'put it anywhere as long as he allowed for proper parking.' RIGGS did not know the tank and equipment had been installed and did not know of the plaintiff's part in the installation until after CLC's lease had terminated.

Plaintiff continued to supply fuel to CLC and to use the tank and equipment in that connection until CLC vacated the premises. Thereupon plaintiff attempted to sell fuel to RIGGS' new tenant, the defendant NORMAN L. GRUBB (GRUBB). Upon being unsuccessful in making an agreement with GRUBB, plaintiff attempted to sell the tank and equipment to GRUBB'S fuel supplier, the defendant ELLER AND SLATE OIL CO., INC. (ELLER AND SLATE). When no agreement could be made as to sale of the tank and equipment plaintiff began to remove it from the premises.

After the pump and some of the equipment had been removed RIGGS forbade removal of the tank and remaining equipment. Since 5 or 6 August 1971 GRUBB AND ELLER AND SLATE have been using the tank and equipment to store and dispense fuel being used by GRUBB and supplied by ELLER AND SLATE. This usage of the tank and equipment has been

made without plaintiff's permission and no compensation has been paid to plaintiff, either for the tank and equipment or for its use.

Upon being prohibited by RIGGS from removing the tank and remaining equipment plaintiff instituted this action to recover possession of the tank and equipment or in the alternative to recover its reasonable value. Installation of the tank involved excavating a hole in the ground, inserting the tank and covering the tank with dirt. Its removal involves nothing more than excavating and removing the tank and refilling the hole in the ground from which it is taken, a procedure customarily, generally and often performed in the trade. Any damages resulting to the premises from such removal can be compensated by a monetary award."

The plaintiff contends that the trial judge committed error in concluding as a matter of law that the underground storage tank and accessory equipment had become the property of Riggs and that the plaintiff had no right to remove them. The plaintiff further contends that the trial court erred in allowing the motion of the defendants for summary judgment and dismissing the action with prejudice.

"In disputes between landlord and tenant, there is a general presumption that the tenant, by annexing fixtures, did so for his own benefit and not to enrich the freehold, and the law accordingly construes the tenant's right to remove his annexations liberally, at least where removal may be effected without material injury to the freehold." 35 Am. Jur. 2d, Fixtures, § 35, pp. 727, 728. See also, *Brunswick-Balke-Collender Co. v. Bowling Alleys,* 204 N.C. 609, 169 S.E. 186 (1933).

"Generally, what constitutes a trade fixture depends on the facts of the particular case, but an article may generally be regarded as a trade fixture if it is annexed for the purpose of aiding in the conduct by the tenant of a calling exercised on the leased premises for the purpose of pecuniary profit." 36A C.J.S., Fixtures, § 38(b), p. 690.

It is clear that the tank, pump and accessory equipment were placed on Riggs' land by plaintiff at the request of CLC, the tenant of Riggs, and that they were trade fixtures to be used by the tenant in the conduct of its business on the leased

premises. As there is no finding or contention to the contrary, we assume that CLC was using the premises for the purpose of pecuniary profit.

[1] The plaintiff in this case had the same right to remove the underground storage tank, pump and accessory equipment that CLC, the lessee, would have had, had it owned them. *Williams v. Wallace,* 260 N.C. 537, 133 S.E. 2d 178 (1963). See also, 36A C.J.S., Fixtures, § 42. There was no written or orally expressed agreement between Riggs and CLC or between Riggs and the plaintiff with respect to the removal of the tank and equipment. "The question whether an improvement remains as a removable trade fixture is frequently said to be one of intent." 36A C.J.S., Fixtures, § 38, p. 688. See also, *Haywood v. Briggs,* 227 N.C. 108, 41 S.E. 2d 289 (1947).

[2] CLC, the original tenant, expressly agreed with plaintiff that the tank, pump and accessory equipment would be and remain the property of plaintiff. CLC, before having the tank, pump and accessory equipment installed, contacted Riggs, asked if he had any suggestions as to where to put the tank, and was told that it could be put anywhere as long as allowance was made for proper parking. We hold that under these and the other circumstances of this case, it was, at the time of installation, the intent of the landlord, the tenant, and the plaintiff that the tank, pump and accessory equipment were to be removable as trade fixtures.

The case before us is distinguishable from *Stephens v. Carter,* 246 N.C. 318, 98 S.E. 2d 311 (1957). In *Stephens,* the plaintiff sought to recover two underground gasoline storage tanks that were used in connection with the operation of a filling station and were located on the premises. These tanks had been orally conveyed to plaintiff by the owner of the realty, but thereafter, and before Stephens had removed the tanks, the owner, by deed, conveyed the entire premises to another without reservation. The tanks had been installed by a previous owner of the realty. The Court held that the tanks were a part of the realty and could be conveyed only by a written instrument. In so holding, the Court quoted from *Springs v. Refining Company,* 205 N.C. 444, 171 S.E. 635 (1933), where the distinction between fixtures attached to land by the owner and fixtures attached to land for purposes of trade by a tenant is pointed out.

The defendant Riggs contends, however, that even if the tank, pump and accessory equipment were trade fixtures, and even if plaintiff had the same right to remove them that CLC had, CLC could have removed trade fixtures only within the term of its lease.

The trial judge, in finding the facts, also found that "on or about August 1, 1971," the lease of CLC expired and Riggs, at that time, leased the premises to Grubb. Plaintiff did not remove the fixtures within the term of the lease of CLC but attempted unsuccessfully to negotiate an agreement to supply diesel fuel oil to the new tenant. From the facts found, it appears that plaintiff had offered to sell the tank, pump and accessory equipment to the new tenant's diesel oil supplier, Eller and Slate, and when it could not sell to Eller and Slate, went upon the premises and began to remove the tank and accessory equipment, and was stopped from doing so by Riggs. Since August 5 or 6, 1971, Grubb and Eller and Slate have been using the tank to store diesel fuel to be used in Grubb's vehicles.

The rule with respect to the question of when a lessee must remove a trade fixture attached to the land is set forth by Justice Ruffin (later Chief Justice) in the case of *Pemberton v. King,* 13 N.C. 376 (1828-1830), as follows:

> " * * * The general rule is that any erection, even by the tenant, for the better enjoyment of the land becomes part of the land; but if it be purely for the exercise of a trade, or for the mixed purpose of trade and agriculture, it belongs to the tenant, and may be severed during the term, *or after its expiration,* though in the latter case the tenant will be guilty of a trespass in entering the land for that purpose, and in that respect only. * * * " (Emphasis added.)

Thereafter, in *Smithwick v. Ellison,* 24 N.C. 326 (1842), the Supreme Court, without mentioning *Pemberton,* said:

> " * * * Whatever things the tenant has a right to remove ought to be removed within the term; for, if the tenant leave the premises without removing them, they then become the property of the reversioner. But where the tenant holds over, even so as to become a trespasser, he will not be considered as having abandoned the things he had a right to remove. * * * "

In *R.R. v. Deal,* 90 N.C. 110 (1884), the plaintiff, under its charter and verbal license from defendant's ancestor, had built a house for a depot on certain lands. Thereafter the plaintiff abandoned the line and removed its tracks to a new location but left the depot building at the original location. Two years after the abandonment of the old line, the defendant entered and took possession of the depot building. The Court cited *Pemberton v. King, supra,* in holding that the defendant did not own the building and that plaintiff had the right to remove it, and said:

> "It is the policy of the law to encourage trade, manufactures, and transportation, by affording them all reasonable facilities. Buildings, fixtures, machinery, and such things, certainly intended and calculated to promote them, are treated, not as part of the land, but distinct from it, belonging to the tenant, to be disposed of or removed at his will and pleasure. Hence if a house, or other structure, is erected upon land only for the exercise of trade or the mixed purpose of trade and agriculture, no matter how it may be attached to it, it belongs to the tenant, and may be removed by him during his term, and in some classes of cases, after it is ended; though the tenant, after his term is over, would, in going back upon the land to get his property, be guilty of trespass in going on the land, and only in that respect, the property would remain his.

> The exceptions to the general rule pointed out above are well settled, and the practical difficulty in any case arises in pointing out when the general rule, or the exception, applies. The exception does not depend upon the character of the structure or thing erected, or whether it is built of one material or another, or whether it be set in the earth or upon it, but whether it is for the purpose of trade or manufacture, and not intended to become identified with and part of the land; this is the test. (Citations omitted.)

> \*     \*     \*

> There are authorities which decide that the tenant may remove the buildings while he remains in possession of the land, but not after he has yielded possession thereof. These go upon the ground that if the tenant neglect to avail himself of his right within the period of his term, the law presumes that he voluntarily relinquished or abandoned

---

---

his claim in favor of the landlord, but such presumption cannot arise, where the facts and circumstances, and the nature of the property, and the uses to which it is devoted, combine to rebut such a presumption. If the tenant yields possession and leaves the structure standing, this fact may be evidence that it was not used or intended only for the purpose of trade or manufacture, or of abandonment of it, but it could not change the established character of the property.

The character of the structure, its purpose and the circumstances under which it was erected, the understanding and agreement of the parties at the time the erection was made, must all be considered in determining whether it became a part of the freehold or not."

The apparent contradictions with respect to the right of a tenant or lessee to remove a trade fixture after he has surrendered and left the leased premises appearing in *Pemberton* and *Smithwick* seem to have been clarified in *R.R. v. Deal, supra.* All three of these cases are cited in *Springs* and *Stephens.*

Upon consideration of the facts in the case before us, we think that when the tank, pump and accessory equipment were placed on the premises, the parties did not intend for them to become identified with and a part of the land, and that the circumstances of this case, the nature of the property involved, and the uses to which the property was devoted combine to rebut the presumption that there was a relinquishment or abandonment of the tank and equipment by CLC and the plaintiff.

We hold, therefore, that the rule set forth in *R.R. v. Deal, supra,* is applicable to the facts in this case, and that the trial judge committed error in concluding *as a matter of law* that Riggs had become the owner of the tank and accessory equipment. See also, *Ingold v. Assurance Co.,* 230 N.C. 142, 52 S.E. 2d 366 (1949); *Belvin v. Paper Co.,* 123 N.C. 138, 31 S.E. 655 (1898); *Overman v. Sasser,* 107 N.C. 432, 12 S.E. 64 (1890); *Feimster v. Johnson,* 64 N.C. 259 (1870); Annot. 6 A.L.R. 2d 322; 1 Restatement of Torts 2d, §§ 177, 178, 180.

The trial judge committed error in allowing the motion of the defendants for summary judgment.

Reversed.

Judges MORRIS and PARKER concur.